92 P.3d 503

**Marsha K. TOLLEY, Plaintiff–Appellant,**

v.

**THI COMPANY, an Idaho corporation; Kent J. Tolley; Alan Tolley; G. Scott Tolley; and Lisa A. Hatch, Defendants–Respondents.**

**Marsha K. Tolley, Plaintiff–Respondent,**

v.

**THI Company, an Idaho corporation; Kent J. Tolley; Alan Tolley; G. Scott Tolley; and Lisa A. Hatch, Defendants–Appellants.**

**Nos. 28454, 28735.**

Supreme Court of Idaho,
Boise, December 2003 Term.

May 5, 2004.

Paine Hamblen Coffin Brooke & Miller, Boise, for appellant. Michael B. Hague argued.

Hall Farley Oberrecht & Blanton, PA, Boise, for respondents. Phillip S. Oberrecht argued.

SCHROEDER, Justice.

Marsha K. Tolley ("Marsha"), and Lee Tolley ("Lee") divorced. The dispute regards the community's shares in THI Company, f.k.a. LMT Inc. (together with its shareholders referred to as "THI"). Marsha claims THI is obligated to make a cash payment to her for her community property interest in the eighty (80) shares of stock Lee held in THI—shares which she was awarded in the divorce proceedings and currently holds. The district court granted summary judgment in favor of THI, dismissing Marsha's complaint with prejudice. THI was awarded costs as a matter of right but denied discretionary costs and attorney fees. Marsha and THI appeal.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Marsha was married to Lee, the son of Garry and Darlene Tolley ("Garry" and "Darlene"). Garry and Darlene acquired and operated successful roofing and siding businesses in Idaho and Utah, gradually bringing their children into the various businesses. In 1995 Garry and Darlene began to transfer their interests in the various businesses to their children by creating a holding company known as THI Company and dividing the stock of THI equally among their five children. The children signed a Stock and Transfer Agreement which limited their abilities to transfer their shares of THI and provided for certain types of events, such as death or divorce, which might affect stock ownership. The spouses of the children, including Marsha, signed a Spouses' Consent to the Stock Purchase and Redemption Agreement. In 1998, THI Company merged with one of the companies whose stock it owned, LMT, Inc., leaving LMT, Inc. as the surviving entity. Shortly thereafter, however, LMT, Inc. officially changed its name to THI Company ("THI"). In March of 1998 the Tolley children signed another Stock Purchase and Redemption Agreement (the "Agreement") and their spouses signed another Spouses' Consent (the "Consent"). References to the Agreement and to the Consent are to the documents signed in 1998 which are virtually identical to the agreement and consent signed in 1995.

In February of 2001 Marsha and Lee Tolley were divorced retroactive to December 28, 2000. In a subsequent property settlement agreement ("Property Settlement Agreement") Marsha and Lee agreed that Marsha would receive all of Lee's shares in THI as her separate property. Relevant portions of these documents are as follows:

**Divorce Property Settlement Agreement:**

3. As a result of the parties' divorce, all of the subject 80 shares of THI should be awarded and transferred to Marsha as her sole and separate property. The parties agree and acknowledge that the award and transfer referenced in the proceeding [sic] sentence is in addition to, and not in lieu of, Marsha's rights to compensation upon divorce for her community interest in said 80 shares under and pursuant to that

Stock Purchase and Redemption Agreement dated March 31, 1998, by and between THI Company fka LMT, Inc., and Idaho corporation ... and that Spouses' Consent to Stock Purchase and Redemption Agreement, dated March 31, 1998, executed Ronald W. Hatch, JoAnna Tolley, RaeAnn Tolley, Kim V. Tolley, and Marsha Tolley (Consent). Specifically, Lee and Marsha agree and acknowledge it was the intent and understanding of the signatories to the Agreement and Consent that in the event of death or divorce of any signatory to the Agreement, the spouse of that party would be entitled to payment from the corporation, and/or shareholders of the corporation, of the value of that spouse's community interest in shares held in the name of said named shareholder. Lee and Marsha agree and acknowledge that Marsha's right to such payment vested in her upon the effective date of the above-referenced Partial Decree of Divorce, and the transfer of the 80 shares standing in Lee's name to Marsha is not, and should not be considered, a waiver or revocation by Marsha of those rights.

**The Agreement:**

\* \* \* \*

1.2 The term "involuntary transfer" means any transfer or disposition of shares under judicial order, legal process, execution, attachment or enforcement of a pledge, trust or other security interest. 1.3 The term "involuntary transferee" means anyone who acquires an interest in or title to the shares by virtue of an involuntary transfer. As used herein, the reference to "Shareholders" shall include an involuntary transferee(s).

\* \* \* \*

3.1 Restriction on Shares and Transfer. A shareholder shall not dispose of, transfer, encumber, pledge or assign (hereafter "transfer or encumber") any shares of the Corporation without the prior written consent of the owners of a majority of a majority of the issued and outstanding shares of the common stock of the Corporation and, further, unless all of such shares are first offered for sale to the Corporation, the other Shareholders then

holding shares or their nominee in the manner hereafter provided. Any purported transfer or encumbrance of shares in violation of the terms of this Agreement shall be void and the Corporation shall not recognize or give any effect to such transaction. Any purported involuntary transfer of shares shall be treated as an offer to transfer or encumber under this Section 3. (Emphasis added)

3.2 Requirement of Offer. In the event a Shareholder ("offering Shareholder") desires to transfer or encumber all or any portion of the shares owned by him (hereafter "Target Shares"), he shall first make an offer to the Corporation and to the other Shareholders then holding shares ("remaining Shareholders"), which offer shall consist of an offer to sell or encumber the Target Shares, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the number of shares involved in the proposed transfer or encumbrance and the terms of said transfer or encumbrance.

3.3 Acceptance of Offer. Within forty-five (45) days after the receipt of such offer, the Corporation may, at its option, elect to purchase all, but not less than all, of the Target Shares. If the offer is not accepted by the Corporation, the remaining Shareholders may, within forty-five (45) days following the end of the period allowed to the Corporation, at their option, purchase all, but not less than all, of the Target Shares. Each of the remaining Shareholders then holding shares shall have the right to purchase his proportionate percentage of the Target Shares. If any of the Target Shares are not purchased by the remaining Shareholders then holding shares first entitled hereto, the term "proportionate percentage" shall include that percentage of the Target Shares not purchased by the remaining Shareholder first entitled thereto determined by dividing the number of the shares owned by the remaining Shareholder by the number of shares owned by all remaining Shareholders then holding

shares other than the remaining Shareholder first entitled to purchase.

If the offer is not accepted by the Corporation or the remaining Shareholders then holding shares within the time above specified, the remaining Shareholders may, by a majority vote of the number of shares owned by them, designate a nominee to purchase all, but not less than all, of the Target Shares for a period of fifteen (15) days following the end of the period allowed to the remaining Shareholder to purchase the Target Shares.

\* \* \* \*

3.6 Purchase Price and Terms—Encumbrance. If the right to purchase arises because of the desire of an offering Shareholder to encumber all or any portion of his shares or because of an involuntary transfer, the purchase price to be paid by the Corporation, remaining Shareholders then holding shares or their nominee, as the case may be, shall be the lesser of (i) the amount of the loan for which the Target Shares shall be paid at the date of the closing. As used herein "loan" shall mean a bona fide loan by an institutional or non-Shareholder lender as evidenced by a written loan commitment signed by such lender.

\* \* \* \*

3.8 Release of Shares from Agreement. If the offer to sell Target Shares is not accepted by the Corporation, the remaining Shareholders then holding shares or their nominee, the offering Shareholder may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the offer, such sale or encumbrance to be made only in strict accordance with the terms therein stated. However, if the offering Shareholder shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the exercise of the option to purchase by the nominee of the remaining Shareholders then holding shares, or, if the remaining Shareholders do not name such a nominee, then within thirty (30) days following the expiration of the time hereinabove provided for the ex-

ercise of the option to purchase by the remaining Shareholders, such shares shall again become subject to all of the restrictions of this Agreement.

\* \* \* \*

4.1 Purchase Upon Death. Upon the death of a Shareholder (hereinafter referred to as the "Decedent"), all of the shares of the capital stock of the Corporation owned by the Decedent (which owned Shares are hereinafter called "Decedent's Shares") shall be sold and purchased as hereafter provided.

4.2 Obligation of Corporation to Purchase. The Corporation shall purchase from the Decedent's personal representative or transferee, as the case may be, and the Decedent's personal representative or transferee shall sell and transfer to the Corporation, all of the Decedent's Shares at the price set forth in Section 4.4.

\* \* \* \*

11.1 Restriction on Spouse Rights. The spouse of a Shareholder shall have no rights to claim any interest in shares of the Corporation, nor shall such spouse claim any dividends, distributions or voting rights, except as to shares in such spouse's name on the Corporation records. This provision shall not affect any community interest such spouse may have to one-half (1/2) of the value of such shares in the event of divorce or death of the Shareholder or the Shareholder's spouse.

11.2 Death, Divorce of Spouse. It is agreed that the provisions of Section 4 do not mature upon the death of a Shareholder's spouse, and each signatory hereto covenants that the Shareholder will inherit his spouse's interest, if any, in the shares. Upon divorce of a Shareholder, each signatory covenants that the Shareholder will receive all the shares as part of the settlement and the spouse will have no claim to said shares as such. In the event that the death of a Shareholder's spouse or the divorce of a Shareholder would result in any shares of the corporation being transferred to someone not a party to this Agreement, then the contemplated transfer of shares will be considered an involuntary transfer and subject to the provisions

of this Agreement covering involuntary transfers of shares.

**The Consent:**

SPOUSES' CONSENT

TO

STOCK PURCHASE AND REDEMPTION AGREEMENT

We, the undersigned spouses of the Shareholders of THI Company, hereby acknowledge that we have read the foregoing Stock Purchase and Redemption Agreement and understand the provisions thereof. Each of the undersigned spouses of Shareholders hereby confirms that he/she understands that the provisions hereof affect any community interest he/she may have in shares of THI Company, held in his/her spouse's name. Each of the undersigned agrees that any community interest he/she may have in such stock will pass to his/her spouse in the event of divorce from his/her spouse or the death of the undersigned spouse, that the provisions of said Agreement are fair and reasonable, and that he/she agrees to accept payments provided therein in lieu of and as consideration for any community interest in such shares. Each of the undersigned agrees to the values established pursuant to the foregoing Agreement and agrees to be bound thereby.

Marsha filed suit claiming that THI is obligated to pay her for her community property interest in the eighty shares of stock that he held in THI which she was awarded in the divorce proceedings. THI and Marsha filed motions for summary judgment. Following hearing, the district court entered a memorandum decision and order granting THI's motion and denying Marsha's motion. The district court entered judgment for THI dismissing Marsha's complaint. The district court awarded THI costs as a matter of right but denied the claims for discretionary costs and attorney fees.

## II.

### STANDARD OF REVIEW

 The standard of review on appeal from an order granting summary judgment is the same standard that is used by the district court in ruling on a summary judgment motion. *Baxter v. Craney*, 135 Idaho 166, 170, 16 P.3d 263, 267 (2000). Summary judgment is appropriate only when the pleadings, depositions, affidavits and admissions on file show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. I.R.C.P. § 56(c). Generally, when considering a motion for summary judgment, this Court liberally construes the record in the light most favorable to the party opposing the motion, drawing all reasonable inferences and conclusions in that party's favor. *Construction Management Systems, Inc. v. Assurance Co. of America*, 135 Idaho 680, 682, 23 P.3d 142, 144 (2001). However, where the evidentiary facts are undisputed and the trial court rather than a jury will be the trier of fact, "summary judgment is appropriate, despite the possibility of conflicting inferences because the court alone will be responsible for resolving the conflict between those inferences." *Riverside Development Co. v. Ritchie*, 103 Idaho 515, 519, 650 P.2d 657, 661 (1982). *See also Cameron v. Neal*, 130 Idaho 898, 900, 950 P.2d 1237, 1239 (1997).

## III.

### THE DISTRICT COURT PROPERLY GRANTED THIS MOTION FOR SUMMARY JUDGMENT

The issues in this case are whether or not: (1) the Agreement is unambiguous, (2) whether the Agreement and the Consent should be read together; (3) whether testimony by the spouse of another shareholder should be admissible as evidence of the parties' intentions; (4) whether language in the Divorce Settlement Agreement acknowledges that the Agreement intended that Marsha receive payment in the event of divorce; and (5) whether THI breached its fiduciary duty to Marsha by failing to state clearly their position that no obligation to Marsha was

created in the Agreement in the event of divorce.

### A. The Agreement is unambiguous with regard to payment to a non-shareholder spouse in the event of divorce, and the parties' intentions can be determined from the plain language of the Agreement.

▮▮ Marsha argues that the Agreement is silent on the subject of payment for a non-shareholder spouse's community property interest in the stock of THI. Consequently, she argues that the Agreement must be read together with the Consent and in light of representations made to the non-shareholder spouses at the time the Agreement was signed to clarify this ambiguity. THI maintains that the Agreement clearly provides for such a circumstance and is unambiguous. As the district court pointed out:

> The objective in interpreting contracts is to ascertain and give effect to the intent of the parties. The intent of the parties should, if possible, be ascertained from the language of the documents. The determination of a contract's meaning and legal effect is a question of law when the contract is clear and unambiguous.

Furthermore, the district court stated:

> Where a contract is clear and unambiguous, the determination and effect of a contractual provision is a question of law to be decided by the court. Interpretation of an ambiguous document presents a question of fact. The determination of whether a document is ambiguous is itself a question of law, which we resolve by examining the document's relevant provisions to determine whether the contract is reasonably subject to conflicting interpretations.

(Internal citations omitted).

Section 1.2 of the Agreement states that any transfer or disposition of shares under judicial order, legal process, execution, attachment or enforcement of a pledge, trust or other security interest shall be deemed an "involuntary transfer." In addition, Section 11.2 of the Agreement states that in the event that the death of a Shareholder's spouse or the divorce of a Shareholder would result in any shares of the corporation being transferred to someone not a party to this Agreement, then the contemplated transfer of shares will be considered an involuntary transfer and subject to the provisions of this Agreement covering involuntary transfers of shares. A transfer of Lee's 80 shares in THI in divorce proceedings through the Property Settlement Agreement fits the definition of an "involuntary transfer" since it is a transfer under "judicial order" and "legal process." Additionally, Section 11.2 of the Agreement states specifically that in the event of divorce, the transference of shares will be treated as an involuntary transfer. As such, Section 3.1 of the agreement directs that "any purported involuntary transfer of shares shall be treated as an offer to transfer or encumber under this Section 3."

In essence, in the event of an "involuntary transfer" resulting from the divorce of a shareholder, THI has the option to purchase the shares, but is not required to do so. *See* Sections 3.3 and 3.8 of the Agreement. The Agreement is not ambiguous, nor is it missing terms. The parties' intent can be clearly ascertained from the language of the Agreement.

### B. Marsha does not have a claim for breach of contract because she is not a party to the Agreement.

▮▮ Marsha argues that the Consent is an integral part of the Agreement, and as a signatory to the Consent she became a party to the Agreement, citing *Charpentier v. Welch*, 74 Idaho 242, 259 P.2d 814 (1953). The district court differentiated the current case from *Charpentier*, reasoning that unlike *Charpentier*, the parties to the various documents are not the same. The parties to the Agreement are the sons and daughter of Garry and Darlene, while the signors of the Consent are their spouses. Although the shareholders' spouses signed the Consent, this does not make them parties to the Agreement. By signing the Consent, Marsha merely acknowledged that in the event of Lee's death or divorce, she agreed to be bound by the terms of the Agreement. There is no language beyond this which would give her rights similar to those she would receive had she been a signatory of

the Agreement. Marsha does not have a claim for breach of contract because she is not a party to the Agreement.

**C. Testimony and evidence offered by Marsha supporting the contention that the parties intended that upon divorce, a monetary value would be given to the non-shareholder spouse cannot be used to vary the terms of an unambiguous document.**

 Marsha offered testimony of RaeAnn Tolley, the spouse of one of the shareholders, as well as the Property Settlement Agreement to support the proposition that it was the intention of the parties at the time the documents were signed that in the event of divorce, payment would be made under the provisions of the Agreement regarding death. THI argues that RaeAnn's testimony is not admissible to vary the terms of an unambiguous document. The parol evidence rule has been applied as follows:

> If the written agreement is complete upon its face and unambiguous, no fraud or mistake being alleged, extrinsic evidence of prior or contemporaneous negotiations or conversations is not admissible to contradict, vary, alter, add to or detract from the terms of the contract.

*Belk v. Martin,* 136 Idaho 652, 657, 39 P.3d 592, 597 (2001).

The Agreement is unambiguous. It cannot be changed or interpreted by reference to matters outside the text. Conversations and comments made leading up to the signing of the Agreement cannot be used to change the plain language of the Agreement.

Regarding the statements made in the Property Settlement Agreement, the district court correctly concluded that the Property Settlement Agreement is not binding on THI which was not a party to that Agreement.

**D. THI did not enter into any agreement, or make any representation to pay plaintiff her community property interest in Lee's shares in the event of divorce.**

 Based upon Marsha's own testimony, neither THI nor any of its shareholders made any representations or entered into any agreement with her that in the event that she and Lee divorced, that she would be paid for her community interest in the THI shares held in Lee's name.

**E. The district court properly ruled that plaintiff's breach of the covenant of good faith and fair dealing claim should be dismissed as a matter of law.**

 The implied-in-law covenant of good faith and fair dealing operates to protect "the right of the parties to an agreement to receive the benefits of the agreement that they entered into." *Metcalf v. Intermountain Gas Co.,* 116 Idaho 622, 627, 778 P.2d 744, 749 (1989). If a party is denied the right to the benefits of the agreement they entered into, then the covenant of good faith and fair dealing, which is implicit in the agreement, is breached. *Id.* Marsha was not a party to the Agreement. The district court correctly ruled that her claim of breach of covenant of good faith and fair dealing claim should be dismissed.

**F. The district court appropriately ruled that Marsha's breach of fiduciary duty claim should be dismissed as a matter of law.**

 To establish a claim for breach of fiduciary duty, plaintiff must establish that defendants owed plaintiff a fiduciary duty and that the fiduciary duty was breached. *Mitchell v. Barendregt,* 120 Idaho 837, 820 P.2d 707 (1991). Marsha argues that as members of the same family, the shareholders of THI were required to clearly state to her that no payment obligation was created in the Agreement in the event of her divorce from Lee. Although, as Marsha states, no one explicitly explained to her that a payment would not necessarily be made in the event of her divorce, by signing the Consent, she explicitly agreed "that the provisions of said Agreement are fair and reasonable, and that he/she agrees to accept payments provided therein in lieu of and as consideration for any community interest in such shares . . . ." and agreed to be bound thereby.

The Agreement is unambiguous with regard to the options given to THI in the event of divorce, and a careful reading of the Agreement by Marsha would have revealed this. There is no evidence or allegation by Marsha of misrepresentations, concealment of facts, or fraud. Any misunderstanding of the payment provisions of the Agreement were due to a misunderstanding of the Agreement's provisions rather than any breach of fiduciary duty on the part of THI.

## IV.

## THI IS NOT ENTITLED TO ATTORNEY FEES UNDER THE AGREEMENT

THI argues that it is entitled to attorney fees pursuant to Section 16 of the Agreement because Marsha is attempting to enforce or add certain terms to the Agreement.

■ Marsha's position relative to THI and its shareholders is analogous to that of a third party beneficiary. In *Lewis v. CEDU Educational Services, Inc.,* 15 P.3d 1147, 135 Idaho 139 (2000), the Court stated:

CEDU maintains that Lewis is bound to the terms of the contracts because he is in essence suing on the breach of those contracts. *Bantz* illustrates this Court's position that a third-party beneficiary must comply with all the terms and provisions of an agreement to the same extent as they apply to the beneficiary. *Bantz,* 124 Idaho at 785, 864 P.2d at 623. The consent-to-sue provision at issue in *Bantz* was much broader as to its application than the "between the parties" language in *Rath* or the language in the contracts in this case. A third party beneficiary must comply with all of the terms of a contract the third party beneficiary seeks to enforce. *However, the third party beneficiary is only bound to the extent those terms apply to him or her. In this case, the arbitration provisions at issue only apply to the contracting parties.* Lewis was not a party to the contracts and is not bound by the arbitration provisions.

*Id.* (emphasis added).

■ A third-party beneficiary is only bound to the extent the terms of a contract apply to him or her. THI was granted summary judgment primarily because the terms of the Agreement applicable to Marsha via the Consent are clear that a cash payment for her community property interest in the event of divorce is only one of several options available to it. Marsha's claim that she is entitled to a cash payment fails because she was bound by those terms *applicable to her.* On the other hand all provisions of the Agreement that are not specifically assented to as contained in the Consent are not applicable to her, including Section 16 of the Agreement which THI asserts as a grounds for granting attorney fees. THI is not entitled attorney fees under Section 16 of the Agreement.

## V.

## THE DISTRICT COURT DID NOT ERR IN DENYING THI AN AWARD OF ATTORNEY FEES PURSUANT TO I.C. § 12–120(3)

■ The district court stated the following concerning THI's request for attorney fees pursuant to Idaho Code § 12–120(3):

Defendants argue that this case involves either a guaranty or a commercial transaction. It involves neither. Plaintiff was attempting to enforce alleged rights under the agreements. These did not arise from any guaranty or from any "transaction" between the parties. While the suit involved corporate matters, this did not implicate a commercial transaction. *See Idaho Newspaper Foundation v. City of Cascade,* 117 Idaho 422, 788 P.2d 237 (Ct. App.1990).

This finding is consistent with the precedent which clearly states that a commercial transaction does not arise in every instance in which a commercial relationship exists. *See Idaho Newspaper Foundation v. City of Cascade,* 117 Idaho 422, 788 P.2d 237 (Ct. App.1990). In *Brower v. E.I. DuPont De Nemours & Co.,* the Court held, "[a]ttorney's fees are not appropriate under I.C. § 12–120(3) unless the commercial transaction is integral to the claim, and constitutes the basis upon which the party is attempting to recover ....." and that "the award of attor-

ney fees is not warranted every time a commercial transaction is remotely connected with a case." 117 Idaho at 780, 792 P.2d at 345 (1990).

## VI.

## THE DISTRICT COURT DID NOT ABUSE IT'S DISCRETION IN DENYING THE REQUEST FOR ATTORNEY FEES PURSUANT TO I.C. § 12–121

### A. Standard of Review

THI maintains that the district court abused its discretion in denying it award of attorney fees pursuant to I.C. § 12–121.

In reviewing an exercise of discretion, this Court must consider "(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason." *Sun Valley Shopping Ctr. v. Idaho Power Co.*, 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991).

### B. The district court correctly perceived the issue of whether to grant attorneys' fees to Marsha under I.C. § 12–121 as one of discretion.

The district court took pains to state the law regarding summary judgment in such situations, the standard under which a summary judgment is granted, and the reason for which fees were not granted. The district court properly perceived the issue as one of discretion.

### C. The district court acted within the outer boundaries of its discretion and consistently with the applicable legal standards.

In its Memorandum Decision and Order, the district court stated the following:

A suit is not frivolous or groundless simply because the case is determined on summary judgment. [citations omitted]. Where a case is resolved on an issue of law, the test is whether the losing party's position is not only incorrect, but also plainly fallacious. [citation omitted]. Given the language of agreements at issue in this case, the Court cannot find that the Plaintiff's position was so fallacious as to be deemed frivolous, unreasonable or without foundation.

Although the district court felt that the case should be decided as a matter of law, it concluded that the language of the agreements was such that Marsha's arguments did not rise to the level of frivolous, unreasonable or without foundation. The district court acted within the outer boundaries of its discretion and consistently with the applicable legal standards.

### D. The district court came to its conclusion through an exercise of reason.

Based on the language contained in the Memorandum Decision and Order, the district court came to its decision through an exercise of reason after weighing the merits of each party's case. Although it ruled that Marsha's positions were erroneous as a matter of law, her arguments were not so fallacious as to be frivolous, unreasonable or without foundation. The district court did not abuse its discretion in refusing to award attorney fees to THI under I.C. § 12–121.

## VII.

## THE DISTRICT COURT DID NOT ERR IN DENYING ATTORNEY FEES PURSUANT TO I.C. § 12–123 AND RULE 11

THI maintains that the district court abused its discretion in refusing to award attorney fees pursuant to I.C. § 12–123 and Rule 11(1), I.R.C.P. In its Memorandum Decision and Order, the district court stated the following:

Lastly, Defendants rely on Rule 11(a)(1) of the I.R.C.P., and I.C. § 12–123. Rule 11(a)(1) is not a basis for an overall award of attorney fees. It is addressed to discrete pleading violations. *See Lundvik [Landvik]v. Herbert*, 130 Idaho 54, 936 P.2d 697 (Ct.App.1997). The same analy-

sis is applicable to claims based on I.C. § 12–121 and Rule 54(e), I.R.C.P. Further, given the Court's analysis under Idaho Code § 12–121, the same result would follow under Rule 11(a)(1), and Idaho Code § 12–123 if they were applicable.

The district court was within its discretion and acted accordingly to the legal standards to it, as evidenced by its reliance above on *Landvik v. Herbert.*

## VIII.

## NO ATTORNEY FEES ARE AWARDED ON APPEAL

This appeal pushes reasonableness to the brink. However, for the reasons articulated by the district court and those set forth in this opinion, no attorney fees are awarded.

## IX.

## CONCLUSION

The decision of the district court is affirmed, including its rulings on attorney fees. THI is awarded costs. No attorney fees are awarded.

Chief Justice TROUT, Justices KIDWELL, EISMANN and BURDICK concur.