146 P.3d 639

In the Matter of the Carter (JJC) Trust Created by Agreement Dated September 9, 1988, As Amended and Restated in its Entirety on June 9, 1999.

Joseph J. CARTER, as successor cotrustee of the JJC Trust, Petitioner–Appellant–Cross Respondent–Respondent–Cross Appellant,

v.

Neta CARTER, personally and as successor cotrustee of the JJC Trust and as successor co-trustee of the J/NC Trust, and Karl Bantz, as successor co-trustee of the J/NC Trust, Respondents–Respondents–Cross Appellants–Appellants–Cross Respondents.

No. 31329.

Supreme Court of Idaho, Boise, December 2005 Term.

Sept. 26, 2006.

Cosho Humphrey, LLP, Boise, for appellants-cross respondents, Neta Carter and Karl Bantz. Thomas G. Walker, Jr. argued.

Eberle, Berlin, Kading, Turnbow, McKlveen & Jones, Chartered, Boise, for respondent-cross appellant, Joseph J. Carter. Joseph H. Uberuaga, II argued.

## SUBSTITUTE OPINION

## THE COURT'S PRIOR OPINION NO. 17

### DATED FEBRUARY 23, 2006 IS HEREBY WITHDRAWN

SCHROEDER, Chief Justice.

This case involves a dispute over the distribution of Joseph Carter's estate. At issue are the effects of a will and subsequent trust executed by Joseph Carter.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Joseph and Neta Carter were married December 27, 1977, in California. It was a second marriage for both. Joseph had five children from his first marriage and Neta had four children from her first marriage. Together, Joseph and Neta did not have any children. They remained married until his death on November 3, 1999.

On November 10, 1978, Joseph Carter executed a will while the couple was living in California. The will provided: "FOURTH: I

give, bequeath and devise to my wife, NETA CARTER, all interest which I may have in the community property of myself and my said wife." On September 9, 1988, while still in California, Joseph Carter created an inter-vivos trust, known as the "JJC trust," to be funded with his separate property. The trust provided for Neta and her children from her first marriage and Joseph's children from his first marriage. In April of 1993, the Carters moved to Idaho. On June 9, 1999, Joseph amended the JJC trust, appointing Neta and Joey (Joseph Carter's son) as successor co-trustees. Documentation of the trust instrument is somewhat confusing. There are three copies of the trust in the exhibits: one in a binder labeled "Original # 1," another in a binder labeled "Original # 2," and a photocopy of the "Original # 2" version. The binder labeled "Original # 1" contains: 6–9–99 Amendment and Restatement of Declaration of the Trust dated 9–9–88 The Carter (JJC) Trust; Idaho Code § 32–906; a letter from Attorney Darin DeAngeli to Carter dated September 8, 1997; and the 7–7–97 Declaration of Trust with the handwritten words "Revoked 6–9–99" written on the page 1 and the initials "JJC." The binder labeled "Original # 2" contains: 6–9–99 Amendment and Restatement of Declaration of the Trust dated 9–9–88 The Carter (JJC) Trust; Exhibit A which is 18 pages long. The 6–9–99 Declaration of Trust reads:

> This is an Amendment and Restatement of the Declaration of Trust dated Sep/09/88 which created The Carter (JJC) Trust for the benefit of Neta and the Carter Kids, of which I, Joseph J Carter am Trustee.

> I hereby re-declare that I hold as Trustee for the uses and purposes hereinafter set forth all assets now held in or which may hereafter be held in each and all of the accounts identified on the Balance Sheets as of May/31/99 under the heading "JJC", attached hereto, marked Exhibit "A" and made a part hereof, which assets constitute my Separate Property as distinguished from the Community Property (under the heading "J/NC" on Exhibit "A") of my present wife Neta and myself.

In addition to this Declaration of Trust there is a 1997 letter from the attorney Joseph Carter consulted indicating the attorney did not think there was a will. The attorney's letter stated:

> As drafted, the trust provides that your separate property will go one-half to Neta, if she survives you, and one-half to your children. If Neta does not survive you, all of your separate property will go to your children.

> There are several potential problems with this arrangement. First, your estate plan does not provide for distribution of your undivided one-half interest in the community property that you and Neta own. *Without a will,* your undivided one-half interest in the community property you and Neta own would pass pursuant to Idaho intestacy law. This means that your one-half interest would pass to Neta (if she survives) as her own property to dispose of as she wishes. Idaho Code § 15–2–102. If Neta does not survive you, then your one-half interest would pass to your issue by right of representation. Idaho Code § 15–2–103. The trust should be revised to include distribution of your interest in the community property. The character of the property (i.e., separate v. community) can be maintained inside the trust.

> * * *

> Lastly, *you should have a will drawn up* so that you can appoint a personal representative, specifically state your intentions as to your disposition of your assets, and in the case of Neta, utilize her unified credit.

(Emphasis added).

Joseph Carter, a lawyer himself, did not inform this attorney of the existence of the will, did not revoke or amend the will and did not follow his attorney's advice to have a will prepared. The aftermath has been a costly dispute.

After Joseph Carter's death, there was a great deal of debate within the family over what property was community property versus separate property, and hence, what property should be in the trust. There was also a dispute over a promissory note executed by Joey Carter and his wife, Devon, payable to "Joseph J and Neta Carter." An extended

course of court proceedings and lawsuits followed: Case No. CV 0002274D (the "District Court Case"); Case No. CV OC 01027479M (the "Magistrate Court Case"); Case No. SPOT 0000832M (the "Trust Case").

Following the consolidation of these court proceedings and lawsuits into one case, a senior district judge was assigned to the case to sit as a magistrate by designation. The case proceeded to jury trial on December 9, 2002. At the conclusion of Joey Carter's case-in-chief, Neta moved the court for a directed verdict on all issues. In response, Joey voluntarily dismissed the claims of constructive fraud, fraud, conversion, and resulting trust.

The trial court submitted special interrogatories to an advisory jury on all issues, with the exception of the promissory note issue, which the parties requested the court to decide alone. The advisory jury answered the interrogatories as follows:

## I. PRELIMINARY QUESTIONS

QUESTION NO. 1: Prior to Joseph J. Carter, Sr.'s Death, did Neta Carter take a position with respect to the JJC trust? YES

QUESTION NO. 2: Did the position that Neta Carter took regarding the JJC Trust produce a benefit for her or detriment to Joseph J. Carter, Sr., or induce Joseph J. Carter, Sr. to change his position? YES

QUESTION NO. 3: Before Joseph J. Carter's death, was Neta Carter's position that the JJC Trust was valid? YES

QUESTION NO. 4: Before Joseph J. Carter Sr.'s death, was Neta Carter's position that the JJC Trust contained separate property? YES

QUESTION NO. 5: Before Joseph J. Carter Sr.'s death, was Neta Carter's position

that she would perform her duties as a successor co-trustee? YES

## II. VALIDITY OF THE JJC TRUST

QUESTION NO. 6: Is the Carter Trust the same as the JJC Trust? YES

QUESTION NO. 7: Did Joseph J. Carter, Sr., identify Morgan Stanley Dean Witter Account No. [account number omitted] as an asset of the JJC trust? YES

QUESTION NO. 8: Did Joseph J. Carter, Sr. identify debt on the Boise rental property as an asset of the JJC trust? YES

## III. TORTIOUS INTERFERENCE WITH AN ECONOMIC EXPECTANCY

QUESTION NO. 9: Before the death of Joseph J. Carter, Sr., did the JJC trust beneficiaries expect to receive a financial benefit from the JJC Trust? YES

QUESTION NO. 10: Before the death of Joseph J. Carter, Sr., did Neta Carter know that the JJC Trust beneficiaries expected to receive a financial benefit from the JJC Trust? YES

QUESTION NO. 11: After the death of Joseph J. Carter, did Neta Carter intentionally interfere with the financial benefit that the JJC Trust beneficiaries expected to receive from the JJC Trust? YES

QUESTION NO. 12: Was Neta Carter's intentional interference with the financial benefit that the JJC Trust beneficiaries expected from the JJC Trust wrongful? YES

QUESTION NO. 13: What damages have the JJC Trust beneficiaries suffered as a result of Neta Carter's wrongful conduct? "The damages suffered by the JJC Trust beneficiaries include:

- Attorney Fees )
- Court Costs } for all leading up to and including this trial
- Travel Expenses )
- Loss of Wages for time spent in court
- Income that would have been disbursed from the trust quarterly to the beneficiaries from 11/99 to the present date.

The trial judge made these findings of fact:

8. On the date of Carter's death, Carter had identified the following as JJC Trust assets:

JJC–CSV Life Insurance

Vovon/JJC

AAA

IRA

DuPont Instruments

Sextant Gro Fund

Boise Rentals

This property should be placed in trust to the extent that Carter was legally able to do so because that was his intent.

In making this finding, the Court has denied the Respondent's motion to strike a portion of Petitioner's Exhibit Number 1.

* * *

10. Joe did not own any separate property on the date of his death. All of the property titled in the name of the JJC Trust on the date of Joe's death was community property belonging to Joe and Neta.

The trial judge made these conclusions of law:

3. All of the property placed into the Trust by Carter was the community property of Neta and Carter; although, Neta should not be allowed to invalidate the Trust, she has not forfeited her interest in the community property placed into the Trust. Neta should not be entitled to set aside from the Trust, and withdraw her one-half interest from the community property in the Trust.

4. Judgment should be entered that the JJC Trust is a valid trust and contains the property documented by Trial Exhibit 1 and set forth in Finding of Fact number 8, less Neta Carter's one-half interest which should be awarded to her. It was Carter's intent to place this property in the JJC trust.

5. Neta's actions in seeking a judicial determination as to the validity of the Trust and her duties, if any, in relationship to the Trust and as personal representative of Carter's estate were not legally wrongful.

Subsequently the trial court addressed the issue of attorney fees and costs in the judgment. The trial court also removed Neta and Joey as co-trustees of the JJC trust and

appointed U.S. Bank of Idaho as the sole successor trustee.

Both sides appealed to the district court which affirmed the magistrate court's decision.

## II.

## STANDARD OF REVIEW

 When reviewing the decision of a district court acting in its appellate capacity over the magistrate division, this Court reviews the magistrate court's decision independently of, but with due regard for, the district court's intermediate appellate decision. This Court will uphold the magistrate court's findings of fact if they are supported by substantial, competent evidence in the record. *State v. Doe*, 140 Idaho 271, 273, 92 P.3d 521, 523 (2004) (internal citations omitted). Furthermore:

[A] factual finding will not be deemed clearly erroneous unless, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made. Finally, clear error will not be deemed to exist if the findings are supported by substantial and competent, though conflicting, evidence. On appellate consideration, we defer to the trial court's special opportunity to determine the credibility of the witnesses who have testified, and to weigh the evidence presented.

*State, Dept. of Health and Welfare v. Roe*, 139 Idaho 18, 21–22, 72 P.3d 858, 861–62 (2003) (internal citations omitted). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept to support a conclusion; it is more than a scintilla, but less than a preponderance.' " *Clear Springs Foods, Inc. v. Clear Lakes Trout Co.*, 136 Idaho 761, 764, 40 P.3d 119, 122 (2002) (quoting *Evans v. Hara's, Inc.*, 123 Idaho 473, 478, 849 P.2d 934, 939 (1993)). Finally, "this Court exercises free review over the lower court's conclusions of law to determine whether the court correctly stated the applicable law, and whether the legal conclusions are sustained by the facts found." *Elec.*

*Wholesale Supply Co., Inc. v. Nielson,* 136 Idaho 814, 820, 41 P.3d 242, 248 (2001).

Also, "[t]he standard of review on appeal from an order granting summary judgment is the same standard that is used by the district court in ruling on the motion for summary judgment." *Tolley v. THI Co.,* 140 Idaho 253, 259, 92 P.3d 503, 509 (2004). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.;* I.R.C.P. 56(c). The facts will be liberally construed and all inferences will be drawn in favor of the non-moving party. *Id.*

## III.

## THE MAGISTRATE COURT DID NOT ERR BY FINDING THAT THE JJC TRUST WAS A VALID TRUST

This Court has stated: "An express trust is created only if the settlor manifests an intention to create a trust. This manifestation of intention requires no particular words or conduct; the settlor simply must evidence his intention, upon transferring the property, or res, to the trustee, that the trustee will hold the res for the benefit of a third person, the beneficiary." *Garner v. Andreasen,* 96 Idaho 306, 308, 527 P.2d 1264, 1266 (1974) (internal citations omitted). Additionally, there must be "certainty as to the property to be subjected to the trust . . . the cestuis que [ (beneficiaries of the) ] trust . . . the terms of the trust . . . the use to which the trust fund is to be applied, and the manner in which it is to be used." *Bliss v. Bliss,* 20 Idaho 467, 476, 119 P. 451, 454 (1911).

The magistrate court found that Joseph Carter established an intervivos trust by written instrument dated September 9, 1988, and that the trust was subsequently amended and restated in its entirety. The magistrate court concluded that the trust is reasonably certain as to Joseph Carter's intent to establish a trust. Joseph had identified the following as JJC Trust assets: JJC–CSV Life Insurance; Vovon JJC; AAA; IRA; DuPont Instruments; Sextant Gro Fund; Boise Rentals. Consequently, the magistrate court concluded that the trust contained the property that had been identified.

The question arises as to whether this property should be included in the trust. Absent trust property there would be no trust. In the creation of the trust Joseph indicated that it was funded with his separate property. None of the designated property is separate property. It is community property. However, this mischaracterization of the property does not defeat the trust. Joseph's mistake as to the nature of the property does not leave the trust unfunded. He had the right to commit his community interest in the property to the trust, and it is only that interest that is subject to the terms of the trust. Neta has a right to her community interest plus any rights granted to her by the trust. The magistrate court's determination that Neta cannot withdraw her one-half interest in the community property from the trust is vacated.

Joseph had five children from a previous marriage, and Neta had four children from a previous marriage. The trust is reasonably certain as to the identity of the beneficiaries. The magistrate court found that:

20. Following Carter's death, and pursuant to Article IV(A) of the trust, the trustees were directed to divide the trust assets as follows:

Upon my death, my Successor Trustees shall divided [sic] the value of Trust assets then held hereunder into the following parts or Shares:

(1) Provided Neta survives me, one Share equal to 50% of such value shall be held as a separate Trust for the primary benefit of Neta;

(2) If Neta survives me the remaining 50% of such value shall be divided into a number of Shares equal to (i) the number of Carter Kids who survive me plus (ii) one Share for the surviving children (as a group per capita [sic] of any Carter Kid who predeceased me, and each such Share shall be held as a separate Trust for the primary benefit of (i) each Carter and (ii) each such group of grandchildren.

(3) If Neta does not survive me or upon her death after having survived me, the 50% Share otherwise designated (or then held) for her benefit shall be divided as follows . . .

Consequently, the magistrate court determined that the trust is reasonably certain as to the manner in which the trust fund is to be administered and used.

"On appellate consideration, we defer to the trial court's special opportunity to determine the credibility of the witnesses who have testified, and to weigh the evidence presented." *State, Dept. of Health and Welfare v. Roe*, 139 Idaho 18, 21–22, 72 P.3d 858, 861–62 (2003) (internal citations omitted). A review of the magistrate court's decision shows its findings support its conclusions.

## IV.

## THE MAGISTRATE COURT DID NOT ERR IN DETERMINING THAT "BOISE RENTALS" WAS AN ASSET OF THE JJC TRUST

The advisory jury answered its special interrogatories in the affirmative when answering the question of whether Boise Rentals was a part of the JJC trust:

QUESTION NO. 8: Did Joseph J. Carter, Sr. identify debt on the Boise rental property as an asset of the JJC trust? YES

The magistrate court adopted this answer in its findings of fact:

8. On the date of Carter's death, Carter had identified the following as JJC Trust assets:

JJC–CSV Life Insurance

Vovon/JJC

AAA

IRA

DuPont Instruments

Sextant Gro Fund

Boise Rentals

This property should be placed in trust to the extent that Carter was legally able to do so because that was his intent.

In making this finding, the Court has denied the Respondent's motion to strike a portion of Petitioner's Exhibit Number 1.

The credibility, weight, and sufficiency of the evidence is for the trier of fact. The magistrate court found Boise Rentals to be an asset of the JJC. That finding is supported by substantial evidence and will not be disturbed on appeal.

## V.

## THE MAGISTRATE COURT DID NOT ERR IN ADMITTING THE JUNE 9, 1999, AMENDED OR RESTATEMENT OF THE TRUST

■ On appeal Neta maintains that Exhibit 1 (previously referred to as "Original # 2"), the 6–9–99 Amendment and Restatement of the Trust, should not have been admitted with the last 18 pages, identified by the trust as Exhibit A, consisting of balance sheets and brokerage statements. At trial Neta's previous counsel did not object to the fact that Exhibit A (the last 18 pages) came with Exhibit 1. Her attorney was concerned about marking the Exhibit in such a way as not to confuse the jury:

MR. MCDONAGH [COUNSEL FOR JOEY]: Your Honor, to eliminate any confusion, I would, also, particularly if there is no objection, move to admit the binder, the original, as an exhibit.

THE COURT: Is it marked at the present time?

MR. MCDONAGH [COUNSEL FOR JOEY]: No.

MR. WALKER [COUNSEL FOR NETA]: It's not marked. My concern with that, Your Honor, is that the trust document itself says that the attachment is marked "Exhibit A."

Well, the documents behind the Exhibit A tab are not marked Exhibit A, and it's going to be confusing to the jury. And they are going to jump to an erroneous conclusion, in my view, that, just because it's behind the tab marked "Exhibit A," that's the equivalent of actually marking the exhibit as "A."

So, I would object to admitting the black binder with that tab. If we take the tab out, I don't have any objection.

THE COURT: Was the tab in the document—that's as you received it?

MR. WALKER [COUNSEL FOR NETA]: This is exactly as we received it from De Angeli. And my only concern is confusing the jury.

THE COURT: What is the next number, as far as the exhibits?

THE COURTROOM CLERK: 59.

MR. MCDONAGH [COUNSEL FOR JOEY]: Actually, we have gone out of order because we skipped several of ours.

MR. WALKER [COUNSEL FOR NETA]: The petitioner's next number would be 57—or the respondent's.

MR. MCDONAGH [COUNSEL FOR JOEY]: We can make it one. I mean, we haven't—

THE COURT: What if we made it 9–A?

MR. MCDONAGH [COUNSEL FOR JOEY]: Sure.

MR. WALKER [COUNSEL FOR NETA]: That is a little bit too much. We can just mark it "1," Your Honor, because he hasn't used "1."

THE COURT: All right. We will mark that Exhibit 1.

MR. WALKER [COUNSEL FOR NETA]: Thank you.

THE COURT: And I will admit Exhibit 1, over your objection.

(Whereupon, Exhibit No. 1 was received in evidence.)

After Exhibit 1 was admitted into evidence, Neta's counsel objected primarily on the basis that the brokerage statements were hearsay because they were business records of the brokerage house, had not been authenticated, and did not fall under the business records exception to the hearsay rule.

The magistrate court denied Neta's motion to strike, determining that the schedules and statements were relevant, independent of the truth of the attachments. That ruling is not in error. The attachments are relevant to show Joseph Carter's belief and intention as to the scheduled property.

## VI.

## THE MAGISTRATE COURT'S RULING ON EQUITABLE ESTOPPEL AND QUASI–ESTOPPEL ARE MOOT

Joey's claims of quasi estoppel and equitable estoppel were dismissed by the magistrate court on Neta's motion for partial summary judgment. Those claims would not change the outcome of the case and are moot.

## VII.

## THE MAGISTRATE COURT DID NOT ERR IN CONCLUDING THAT THE ELEMENT OF WRONGFULNESS IN THE TORT OF INTENTIONAL INTERFERENCE WITH EXPECTANCY IS AN ISSUE OF LAW AND NOT AN ISSUE OF FACT

The magistrate court concluded that the element of wrongfulness in the tort of intentional interference with expectancy is an issue of law and not an issue of fact. The district court affirmed. This Court adopts the analysis of the district court in reviewing this matter on appeal.

[I]t is an issue of law for the court to determine whether the nature of the act complained of could be considered wrongful or not. In other words, the definition of what could be considered wrongful is a question of law. Once the act is so defined by the judge, it then becomes a jury question to determine whether the act was or was not committed as defined.

In this case, there were no instructions to the jury on the definition of what could or could not be considered as a "wrongful act." None were requested. The only message to the jury was contained in Question No. 12, which asked, "Was Neta Carter's intentional interference with the financial benefit that the JJC Trust beneficiaries expected from the JJC trust wrongful?" Although the jury answered this question "yes," the trial judge in the post trial memorandum concluded that the question called for a conclusion of law, not fact, and was therefore for the court to determine. In his conclusions of law, the trial judge concluded that Neta's actions

could not be construed as wrongful as a matter of law.

In this case, it is obvious that Neta had her own expectancy, and her own interests to advance and protect in the matter. It is not a tort where one acts to protect her own economic interests, even if there is interference with the contract expectancy of another, so long as the acts of the intervenor are not independently wrongful. The issue of whether or not the actions complained of are or are not "wrongful" in this context is for the court to determine in defining the issues, and would normally have been included in the instructions. The issue for the jury to determine is whether or not the alleged tortfeasor acted in the manner alleged.

Further, the trial judge found that Neta had not breached any fiduciary duty, had not breached any trust, and finally that Neta had the right to seek judicial action to determine the validity of the trust. Therefore, none of these acts could be construed as "wrongful acts" in the context of petitioner's claims for tortuous interference. Counsel argued that inconsistencies in Neta's testimony could be taken as "wrongful." However, any testimony from Neta came about after the claims were filed, and had nothing to do with the nexus of the tort. The issue of Neta's credibility is irrelevant to the issue of wrongful acts. There were no other actions that anyone could point to that Neta took that could be considered interference. In practical fact, the issue should not have been given to the jury in the first place. In this case, it was not error to remove it from the jury result post verdict.

## VIII.

## THE MAGISTRATE COURT DID NOT ERR IN ITS ORDER REGARDING ATTORNEY FEES AND COSTS

 On appeal the parties contest the following decisions by the magistrate court:

(1) Whether the magistrate court erred in refusing to award costs and fees to Neta with respect to claims voluntarily dismissed by Joey.

(2) Whether the magistrate court erred by ordering that the fees and costs incurred by Karl Bantz be paid out of the JJC Trust rather than by Joey individually.

(3) Whether the magistrate court erred in denying Joey's claims on behalf of the Trust against Neta for reimbursement of expenses to the Trust, and accordingly, whether the Trust is entitled interest on monies due to it from Neta?

As stated in *Elec. Wholesale Supply Co., Inc. v. Nielson,* 136 Idaho 814, 824, 41 P.3d 242, 252 (2001) (internal citations omitted):

An award of attorney fees is a matter best left to the sound discretion of the trial court, and the burden is upon the appellant to demonstrate that the trial court abused its discretion. In reviewing an exercise of discretion, this Court must consider "(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason."

 As concerns the magistrate court's refusal to award costs and fees to Neta with respect to claims voluntarily dismissed by Joey, I.R.C.P. 54(d)(1)(B) permits the trial judge to "apportion the costs in a fair and equitable manner after considering all of the issues and claims involved in the action and the resultant judgment or judgments obtained." The magistrate court found that "each side prevailed in part and did not prevail in part. Petitioner sought to recover more than twice that which was awarded; Respondent's position was that the Petitioner should recover nothing. Neither party should recover costs or fees regarding the remaining issues." The magistrate judge's decision was one of discretion and the judge acted within the outer boundaries of his discretion, reaching the decision by an exercise of reason. This decision will not be disturbed on appeal.

As it concerns whether the magistrate court erred by ordering that the fees for

Karl Bantz be paid out of the trust, the magistrate court awarded Karl fees pursuant to I.C. § 12–121, I.R.C.P. 54(e)(1), and I.C. § 12–123. Idaho Code § 12–123(2)(d) specifically provides that: "An award of reasonable attorney's fees ... may be made against a party, his counsel of record, or both." In orders submitted by stipulation to augment the magistrate court provided that Karl's fees were to be taken out of the trust. That determination will not be disturbed on appeal.

As it concerns whether the magistrate court erred in denying Joey's claims on behalf of the Trust against Neta for reimbursement of expenses to the Trust, and accordingly, whether the Trust is entitled interest on monies due to it from Neta, there is no basis to determine that Neta acted improperly in her management of the trust assets.

## IX.

### ATTORNEY FEES ON APPEAL

█ "[A]n award on appeal is the same as at the district court level. Where an appeal is brought or defended 'frivolously, unreasonably, or without foundation,' then the appellate court will grant an application for attorney's fees." *O'Boskey v. First Fed. Sav. & Loan Ass'n of Boise,* 112 Idaho 1002, 1010, 739 P.2d 301, 309 (1987) (quoting I.R.C.P. 54(e)(1)); *see also* I.C. § 12–121. Idaho Code § 68–106(c)(24)(25) provides that a trustee is empowered to:

(24) to employ persons, including attorneys, auditors, investment advisors, or agents, even if they are associated with the trustee, to advise or assist the trustee in the performance of his administrative duties; to act without independent investigation upon their recommendations; and instead of acting personally, to employ one or more agents to perform any act of administration, whether or not discretionary;

(25) to prosecute or defend actions, claims, or proceedings for the protections of trust assets and of the trustee in the performance of his duties.

Additionally, I.C. § 68–1005(a) provides that: "[A]ll expenses incurred in connection with

the settlement of a decedent's estate, including ... fees of attorneys ... and court costs shall be charged against the principal of the estate." Both Neta and Joey, as co-trustees, have pursued this litigation with the belief that each is defending either the trust or the estate. Both have acted within their prescribed roles as trustees protecting and defending actions and claims. Attorney fees and costs are awarded to Neta and Joey to be charged against the principal of the estate.

## X.

### CONCLUSION

The decision of the magistrate court that a valid trust was created is affirmed. The trust was funded with community property and the trust determines the disposition of Joseph Carter's interest in that community property. Neta has the right to control her interest in that community property. The case is remanded for a determination of the manner of disposition of the property consistent with this opinion. The determination of costs and attorney fees by the magistrate and district courts are affirmed. On appeal costs and attorney fees for the respective parties shall be paid by the trust.

Justices TROUT, EISMANN, BURDICK and JONES concur.