IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 43074

| | |
|---|---|
| IN THE MATTER OF: | ) |
| -------------------------------------------------------- | ) |
| GREATER BOISE AUDITORIUM DISTRICT, | ) Boise, September 2015 Term |
| | ) |
| | ) 2015 Opinion No. 100 |
| Petitioner-Appellant, | ) |
| | ) Filed: October 15, 2015 |
| v. | ) |
| | ) Stephen W. Kenyon, Clerk |
| DAVID R. FRAZIER, | ) |
| | ) |
| Respondent. | ) |
| | ) |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Lynn Norton, District Judge.

The decision of the district court is <u>reversed</u>. No attorney fees on appeal are awarded.

Givens Pursley, LLP, Boise and Hawley Troxell Ennis & Hawley, LLP, Boise, attorneys for appellant. Christopher H. Meyer argued.

Runft & Steele Law Offices PLLC, Boise, attorneys for respondent. John L. Runft argued.

_____

W. JONES, Justice

## I. NATURE OF THE CASE

Appellant, the Greater Boise Auditorium District (the "District") filed a petition for judicial confirmation, pursuant to Idaho Code section 7-1304, asking the district court for a determination that a lease the District intended to enter into did not violate the Constitution's Article VIII, section 3 clause prohibiting a municipal body, without voter approval, from incurring indebtedness or liabilities greater than it has funds to pay for in the fiscal year. Respondent, David R. Frazier (Frazier), a Boise resident and property owner, objected to the requested judicial confirmation, and appeared in the case to contest it. The lease was one part of a complex agreement by which the District intended to own a new facility being constructed. The

1

District asserts that the lease in question does not subject it to any long-term liabilities. Frazier argues that both the lease and the overall agreement unconstitutionally subject the District to liabilities greater than it has funds to pay for in the fiscal year. The district court denied the Petition for Judicial Confirmation and the District appeals. Frazier seeks attorneys' fees on appeal. We reverse the district court's denial of the District's request for judicial confirmation and hold that the agreements into which it entered satisfy Article VIII, section 3 of the Constitution.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The District is a governmental subdivision that is organized under Idaho Code section 67-4901 and operates in Boise. The District currently operates the Boise Centre, a convention center in Downtown Boise. The District seeks to expand operations by acquiring a new facility (hereinafter the Centre Facility) being constructed near the Boise Centre. But the District, as a governmental subdivision, is subject to Article VIII, section 3 of the Idaho Constitution. That section provides in pertinent part:

> No county, city, board of education, or school district, or other subdivision of the state, shall incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year, without the assent of two-thirds of the qualified electors thereof voting at an election to be held for that purpose . . . Any indebtedness or liability incurred contrary to this provision shall be void . . . .

IDAHO CONST. art. VIII, § 3.[1] Believing it would not subject itself to the Constitution's super-majority vote requirement, the District entered into a series of agreements with multiple parties, none of which were put up for vote. The District's overall plan was succinctly summarized by the district court:

> The District and [the developer] will enter [an agreement] for the construction and sale of the new facilities. The District will immediately (or very shortly) thereafter, assign all of its interest in the new facilities to [a third party] who has the power to obtain financing through Wells Fargo, a commercial lender, and issue a promissory note and deed of trust to secure financing. Once the new facilities are completed, the [third party] will then lease the new facilities back to the District, utilizing the annual lease payments to pay the principal and interest due on the promissory note.

---

[1]  Article VIII, section 3 of the Constitution also provides for a number of exceptions to the requirement for voter approval, but no party asserts that any such exception applies to this case.

2

Through this plan, the District hoped to obtain ownership of the Centre Facility without ever incurring an indebtedness or liability that would subject it to Article VIII, section 3 and thus require a vote.

The Centre Facility is being constructed by K.C. Gardner Company, L.C. (Gardner), a limited liability company from Utah. The third party, who was to accept the assignment and then lease the Centre Facility to the District, was the Urban Renewal Agency of Boise City (the "Agency"). The Agency, also known as the Capital City Development Corporation, is an urban renewal agency under Idaho Code Title 50, chapters 20 and 29. Because the Agency is not a governmental subdivision, it is not subject to Article VIII, section 3 of the Constitution and could therefore obtain financing without a vote. However, the Agency's financing was conditioned on judicial confirmation of the lease. The Agency thus would not accept the assignment of the District's right and obligation to purchase the Centre Facility without confirmation that the proposed agreement was legally proper. To that end, on June 11, 2014, the District filed its first petition for judicial confirmation of the proposed lease. In that case, Ada County Case no. CV-OT-2014-11320, the district court judge determined that the lease violated Article VIII, section 3 of the Constitution because it exposed the District to liabilities beyond what it could afford in the fiscal year. Some of the liabilities over which the court expressed concern were certain indemnity guarantees and assumption of damages resulting from environmental law violations. *Id.* The District then requested time to provide notice for and file a motion for reconsideration.

But no motion for reconsideration was ever filed. Rather, the District attempted to address the district court's concerns by modifying the agreements with the Agency and with Gardner. On November 20, 2014, the District and Gardner entered a contract titled the "Amended and Restated Master Development Agreement Between Greater Boise Auditorium District and KC Gardner Company, L.C." (hereinafter "MDA"). The MDA generally sets out what the parties intend to do, and how they intend to do it. Despite being a general statement of intent, the MDA also contains mandatory language:

> 2.2 Purchase and Sale Agreement. Gardner and the District shall execute and enter into a Purchase and Sale Agreement (the "PSA") for the Centre Facilities provided that Gardner shall sell to the District and the District shall purchase from Gardner the Centre Facilities. The PSA shall be substantially in the form attached hereto as Exhibit "D". The PSA shall include the right to purchase therein provided to the Capital City Development Corporation.

3

This language binds the District to purchase the Centre Facility, regardless of whether it is able to secure assignment of its obligation to the Agency. The District asserts that it currently has sufficient funds set aside to pay the full purchase price of the Centre Facilities in case it is not able to successfully assign its obligation to the Agency. The actual instrument selling the Centre Facility to the District is called the Purchase and Sale Agreement (hereinafter "PSA").

Following the MDA, the District entered an agreement with the Agency, under which the District would assign to the Agency its right and obligation to purchase the Centre Facility. The agreement is called the Amended and Restated Development Agreement (hereinafter "RDA"). Under the RDA, the Agency would obtain financing from Wells Fargo to purchase the Centre Facility from the District. The Agency would be responsible for the financing note. The Agency would then lease the Centre Facility back to the District under what is called the Centre Lease. The payments under the Centre Lease would cover the principal and interest payments on the note secured by the Agency to finance the purchase. Once the note becomes fully satisfied, the District has the option to purchase the Center Facility for $10 plus any of the Agency's fees or expenses then unpaid. This option to purchase is exercisable in the District's sole discretion, and does not obligate the District to purchase the Centre Facility from the Agency. If the District ever has the capital on hand before the note is fully satisfied, it may also elect to pay the full amount due on the note and thereby purchase the Centre Facility. The Centre Lease provides a term beginning on its effective date and terminating on November 15, 2015. It is then renewable for a total of twenty-four consecutive one-year terms in the sole discretion of the District. This makes the lease a non-appropriation lease, allowing the District to back out of the contract at any time the District does not appropriate money for the lease for the upcoming year.

Unlike the previous lease, the Centre Lease omits the indemnities and environmental liabilities that concerned the district court when reviewing the first petition. Further, the Centre Lease provides for a "Lease Contingency Fund," which contains $350,000 of funds the District has on hand, and which would provide the sole remedy for damages or fees arising from any potential negligence from the District. Another section of the Centre Lease limits the District's liability in the event of default to no more than whatever rent is due for the current term of the lease (thus never exceeding one year's rent). This section of the Centre Lease also purports to limit (to the same terms) the remedies of the Agency's financier against the District.

4

The District asserts that this form means there is no risk of any unconstitutional liability. If it does not have the funds to continue the lease in a particular year, it can simply elect not to renew the lease without penalty and walk away. It further asserts that the damage limitation clause as well Lease Contingency Fund mean that the Centre Lease cannot subject it to any long term liabilities.

Similar to the agreement that was the subject of the first petition, under the RDA's terms, the Agency would not obtain financing and thus not accept assignment of the District's obligation and requirement to purchase the Centre Facility without legal approval of the constitutionality of the proposed Centre Lease. The District thus filed a second petition for judicial confirmation on December 19, 2014 in the district court for Ada County. All statutorily required procedures were properly followed. Under Idaho Code section 7-1307, Frazier properly filed an answer and responsive pleading objecting to the judicial confirmation. The district court took judicial notice of the facts and documents of the first petition,[2] but applied its own analysis to the new agreements. While the district court recognized that it had only the question of the lease's validity before it, it examined the propriety of all of the agreements as a whole. It found that Wells Fargo (the Agency's financier), as a non-party to the lease, was not bound by the lease's limitations on liability. Thus the court was "not convinced there is no theory or law or set of facts under which Wells Fargo could not recover against the District." This presented a sufficient liability for the district court to hold the lease unconstitutional. Further, the district court found that the lease may be deemed an actual or equitable mortgage, in which case there would be "corresponding liability" incurred by the District. The district court, on different grounds from the judge who denied confirmation in the first petition, denied the District's second petition for judicial confirmation, finding that the agreement subjected the District to "significant liabilities beyond the year in which the contract is incurred."

The District appeals the district court's denial of its petition for judicial confirmation. Frazier objects and requests attorneys' fees.

### III. ISSUES ON APPEAL

---

[2] The first petition came before district court judge Melissa Moody, and the second petition which is appealed here came before district court judge Lynn Norton.

**1.** Whether the Centre Lease, as a non-appropriation lease and as part of the overall agreement, subjects the District to greater liabilities than it has funds to pay for in the fiscal year in violation of the Constitution.

**2.** Whether Frazier is entitled to attorneys' fees.

## IV. STANDARD OF REVIEW

Both the scope of the Court's examination in a petition for judicial confirmation, as well as the constitutionality of the proposed lease are issues over which this Court exercises free review: "Both constitutional questions and questions of statutory interpretation are questions of law over which this Court exercises free review." *CDA Dairy Queen, Inc. v. State Ins. Fund*, 154 Idaho 379, 382, 299 P.3d 186, 189 (2013) (citations omitted).

When reviewing a district court's contract interpretations, "[t]he existence of ambiguity determines the standard of review of [the] interpretation . . . ." *Mountainview Landowners Coop. Ass'n, Inc. v. Cool*, 139 Idaho 770, 772, 86 P.3d 484, 486 (2004). "The legal effect of an unambiguous written document must be decided by the trial court as a question of law." *Id.* "If, however, the instrument of conveyance is ambiguous, interpretation of the instrument is a matter of fact for the trier of fact." *Id.* "Whether a document is ambiguous is a question of law." *Machado v. Ryan*, 153 Idaho 212, 217–18, 280 P.3d 715, 720–21 (2012).

## V. ANALYSIS

**A. The district court erred when it held that the Centre Lease exposed the District to unconstitutional long-term liabilities, and similarly erred in denying judicial confirmation based on the overall agreement's constitutionality.**

As a preliminary matter, the statute under which review was sought contains a number of procedural requirements, such as proper public notice, in order for a court to have jurisdiction in the matter. I.C. § 7-1304(3). The district court properly found below, and indeed no party asserts otherwise, that all such provisions were properly complied with and thus there are no procedural issues presently before the Court.

*1. The statute under which confirmation was sought requires the Court to examine the Centre Lease, in addition to the overall agreement.*

The District sought judicial confirmation under Title 7, chapter 13 of the Idaho Code. That chapter provides that governmental subdivisions such as the District may request "a judicial examination and determination of the validity of any bond or obligation or of any agreement or security instrument related thereto, of the political subdivision, whether or not such bond or obligation agreement has been validly exercised, or executed." I.C. § 7-1304. If all of the

6

procedural requirements laid out in the chapter are met by the political subdivision (and here they were), then "the court shall examine into and determine all matters and things affecting each question submitted, shall make such findings with reference thereto and render such judgment and decree thereon as the case warrants." I.C. § 7-1308. The district court below recognized that "[t]here is no Idaho caselaw interpreting Idaho Code § 7-1304, and therefore the applicable legal standard has never been identified by an appellate court." The district court concluded that "the Court can consider the context surrounding the contract to help the Court determine whether the contract itself is valid."

The district court's conclusion was accurate. Courts have a duty to consider the context of a larger agreement to determine whether a contract is valid in cases brought under Idaho Code section 7-1304. The statute provides courts the authority, and in fact requires them, to examine and determine "*all* matters and things affecting each question submitted" and then "render such judgment and decree thereon as the case warrants." Idaho Code section 7-1308 (emphasis added). By the plain language of that statute, a court must consider a separate contract not immediately before it as long as it affects the contract at issue, and may then adjudge the question presented. We now hold that courts have a duty to examine other documents which affect the question submitted, and then to determine the propriety of the contracts before them.

In this case, the District sought only:

[A] judicial determination that the Lease Agreement, which obligates the Petitioner for an initial term ending on the District's Nov. 30 fiscal year-end, and is renewable each year thereafter through appropriation, budgeting and affirmative notice of the intent to renew, is a valid obligation under Article VIII, § 3 of the Idaho Constitution.

Despite noting that it was only required to consider the narrow issue of the Centre Lease's constitutionality, the district court in this case examined other agreements which affected the Centre Lease. It was correct to do so. If the district court found that other documents such as the MDA or the PSA affected the Centre Lease (and in this case they unquestionably did), then it had a duty to examine them to determine the question presented by the District.

2.      *The Centre Lease does not subject the District to greater liabilities than it can pay in the fiscal year by virtue of its non-appropriation provisions, and thus satisfies Article VIII, section 3 of the Constitution.*

7

The Centre Lease does not incur long-term liability because the District has properly limited its liability, and the framers of the Constitution were more concerned with contingent liabilities than potential liabilities. The constitutional provision at issue here prevents governmental subdivisions from incurring "any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year," without a super-majority vote of two thirds of qualified voters. IDAHO CONST. art. VIII, section 3. Again, there are a number of exceptions to this requirement, but none is relevant nor even raised here.

While many states have a similar constitutional provision, this Court has held that Idaho's is among the strictest, if not the strictest, in the nation. *Feil v. Coeur d'Alene*, 23 Idaho 32, 49, 129 P. 643, 649 (1912).[3] This Court in *Feil* was careful to distinguish an "indebtedness" from a "liability," the latter being "a much more sweeping and comprehensive term than the word 'indebtedness[.]'" *Id.* at 23 Idaho 49–50, 129 P. 649. Though somewhat loosened over time by constitutional amendment, the prohibition against incurring liabilities without a vote is still quite strict. *See, e.g.*, *Hanson v. Idaho Falls*, 92 Idaho 512, 514, 446 P.2d 634, 636 (1968). *Feil*'s analysis of the scope of Idaho's constitutional prohibition that has not been superseded by constitutional amendment[4] remains good law. *See Boise v. Frazier*, 143 Idaho 1, 9, 137 P.3d 388, 396 (2006).

In *Feil* this Court also adopted a standard for what constitutes a "liability." *Feil*, 23 Idaho 32, 50, 129 P. 643, 649. Examining Bouvier's Law Dictionary and its sources, this Court stated that a liability is a "[r]esponsibility; the state of one who is bound in law and justice to do something which may be enforced by action. This liability may arise from contracts, either express or implied, or in consequence of torts committed. The state of being bound or obliged in law or justice." *Id.* Adopting this definition, this Court further distinguished an indebtedness from a liability. *Boise Dev. Co. v. Boise*, 26 Idaho 347, 360–61, 143 P. 531, 535 (1914). We used a hypothetical example of how a liability can be incurred while indebtedness has not. *Id.* This

---

[3] Indeed, in *Feil*, this Court stated, "the framers of our Constitution employed more sweeping and prohibitive language in framing section 3 of article 8, and pronounced a more positive prohibition against excessive indebtedness, than is to be found in any other Constitution to which our attention has been directed." *Feil v. City of Coeur d'Alene*, 23 Idaho 32, 129 P. 643, 649 (1912).

[4] *Feil* contained analysis rejecting a "special fund" doctrine which was later overturned by constitutional amendment. *Asson v. City of Burley*, 105 Idaho 432, 439, 670 P.2d 839, 846 (1983).

8

Court found that presently obligating oneself to future payments is not a present indebtedness, but it is a present liability:

> If A by a valid contract employs B to work for him for the term of one year at $50 per month, payable at the end of each and every month, would this contract not be a liability on A. as soon as executed? A debt of $50 would accrue thereon at the end of each month, but the liability would be incurred at the time the contract was entered into.

*Id.* at 26 Idaho 363, 143 P. 535. Accordingly, governmental subdivisions are liable for the aggregate payments due over the total term of a contract rather than merely for what is due the year in which the contract was entered. *See id.* In the *Boise Dev. Co.* case, a municipal corporation subject to Article VIII, section 3 entered a contract whereby it "assumed and entered into terms for the payment of existing debts or liabilities which grew out of certain torts committed by the city against appellant." 26 Idaho 347, 363, 143 P. 531, 536. While the municipal corporation may have been able to pay the obligations due in the year in which it entered the contract, there was nothing guaranteeing it could continue to make the payments to which it was obligated in future years. *Id.* The obligation to pay in future years constituted a liability that the municipal corporation required a super-majority vote to incur under the Constitution. *Id.* Because it had not done so, the agreement was invalid and the contract void. *Id.* at 26 Idaho 366, 143 P. 547.

The aggregation principle was specifically extended to leases by this Court in *Williams v. Emmett*, 51 Idaho 500, 506, 6 P.2d 475, 477 (1931). In that case, a governmental subdivision claimed that a lease, binding for a number of years, did not require a vote to enter into because it could afford the payments for the year in which it entered the lease. *Id.* at 51 Idaho 506–07, 6 P.2d 477–78. We disagreed. *Id.* Quoting the aggregation principle from *Boise Dev. Co.*, this Court aggregated all the lease payments to which the governmental subdivision had bound itself (in that case the full length of the entire multi-year lease) and used that as the measure of "liability" that the subdivision would need to be able to pay off in the year in which it entered the lease. *Id.* Because the entity could only guarantee it had the funds for the first year's payment when it executed the lease, the lease constitutionally required super-majority voter approval. *Id.* Notably, that lease was not the sort of non-appropriation lease at issue here. Rather, the governmental subdivision there was bound for multiple years under the terms of the lease, unlike here, where the entity is bound only for the one year term and then has the option to renew the lease. *Id.* at 51 Idaho 506–07, 6 P.2d 477–78.

9

The relevant analysis for these cases is examining the monetary obligations to which the governmental subdivision bound itself. As a further extension of this principle, this Court acknowledged that it may truly be irrelevant whether an agreement is a true lease or a disguised sales contract. *Id.* As long as the agreement does not bind the party to a greater liability than it has funds to pay for in the fiscal year, the characterization of the agreement does not matter:

> We doubt whether it makes any difference whether it may be appropriately denominated a lease or a conditional sales contract. The important matter is, does it create "any indebtedness or liability in any manner or for any purpose, exceeding in that year the income and revenue provided for it for such year"?

*Id.* at 51 Idaho 506, 6 P.2d 477. We reaffirm that principle now. The relevant determination under Article VIII, section 3 is whether the governmental subdivision presently bound itself to a liability greater than it has funds to pay for in the year in which it bound itself. Questions about the characterization of the document only matter to the extent that they could provide additional liability.

In the present case, the Centre Lease does not bind the District to any specifiable liability beyond the District's ability to pay in the year in which it was entered. It binds the District to pay rent of one year, something it currently has the funds to do. After the fiscal year's end, if the District has the funds to again pay for one year's rent, then it may renew the lease; if it does not, it does not have to pay anything by the terms of the contract. The District simply has not bound itself to a contractual liability beyond the fiscal year under the Centre Lease.

Despite recognizing the District's sole discretion to renew the lease, the district court still found an unconstitutional liability. The district court's concern was that the "entire financing structure" could fail, which, in the district court's view, would allow the financier Wells Fargo to pursue remedies against the district. It is these potential remedies that the district court considered to be liabilities that the District may not have the funds to pay for in the year the lease was entered. But the district court never identified what such a remedy could be. Neither did Respondent. It is difficult to conceive of a set of facts under which Wells Fargo could recover against the District from its entry into the Centre Lease. The district court and Frazier are correct in that Wells Fargo, as financier to the ultimate purchaser, will have an interest in the Centre Facility, but that interest will be based on an independent agreement between Wells Fargo and the Agency; the District is merely a tenant at that point. While we do not suggest that no

10

potential claim by a party with interest in land could ever exist against a tenant,[5] with neither the district court nor Respondent identifying a specific ground for potential remedy against the District, we hold that no liability sufficient to bind the District for Article VIII, section 3 purposes arises expressly from the Centre Lease.

The district court specifically examined the Centre Lease provisions limiting relief against the District. Those provisions limit damages to no more than the rent due for one term of the lease and costs and fees provided for from the Lease Contingency Fund. It found that Wells Fargo, as a non-party to the lease, was not bound by the terms limiting recovery against the District. This analysis is correct, and indeed Wells Fargo is not bound by those provisions.[6] But instead of identifying any theory under which Wells Fargo could recover against the District, the district court simply was "not convinced that there is *no* theory of law or set of facts under which Wells Fargo could not recover against the District." (emphasis added). It was concerned with "potential liabilities."

A liability "may arise from contracts, either express or implied, or in consequence of torts committed." *Feil*, 23 Idaho 32, 129 P. 643, 649 (1912). Notably, this definition includes "torts committed," not potential torts that may be committed. *Id.* In the present case, the District has not incurred any unconstitutional contractual liabilities: no one suggests the limitations of remedies would be insufficient against the Agency, and, as the district court pointed out, Wells Fargo is not a party to the contract, and thus cannot have contractual remedies under it. S*ee Tolley v. THI Co.*, 140 Idaho 253, 262, 92 P.3d 503, 512 (2004). The District further has not committed any torts that have been raised before this Court. It may commit a tort in the future that could subject it to damages to Wells Fargo, but as discussed above, only torts committed can result in constitutional liabilities, not torts not yet committed. *Id.* Wells Fargo certainly has an interest in the premises to be leased, but it has no direct contract with the District. Any encumbrances or damages from failure to pay the note financed by Wells Fargo would be brought against the owner of the Centre Facility (the Agency), not against the District, who would merely be a tenant.

The framers, while being quite concerned with incurring contingent liabilities, were not worried about all potential liabilities. The distinction is an important one. While barring

---

[5] The possibility of a claim of waste by the interested party is one such potentiality.
[6] Non-parties are generally not bound by contracts they did not enter into. *See, Tolley v. THI Co.*, 140 Idaho 253, 262, 92 P.3d 503, 512 (2004).

municipalities from incurring contingent liabilities without a vote serves the purpose of ensuring elected officials not bind future officials and taxpayers to irresponsible financial deals without citizen approval, barring the incurring of all *potential* liabilities would essentially handcuff governmental subdivisions, preventing them from entering any deal without a super-majority vote. There are uncountable potential liabilities that could arise, and it would be excessively difficult and inefficient, if not outright logically impossible,[7] to prove that one is subject to absolutely no potential liabilities. Further, it is similarly difficult and inefficient to require governmental subdivisions to overcome this problem of potential liabilities by subjecting every contract to a vote. Justice J. Jones recognized this difficulty in a 2008 concurrence:

> It is a virtual impossibility to present every multi-year governmental contract or lease to the public for a vote. Thus, leases and other contracts that are intended to extend beyond one year always contain provisions (1) making the government's performance subject to availability of appropriated funds and (2) making the agreement renewable on an annual basis for the contemplated term.

*In re Univ. Place/Idaho Water Ctr. Project*, 146 Idaho 527, 547, 199 P.3d 102, 122 (2008) (J. Jones, J., concurring). When considering this, the district court stated, "the fact that a contract clause commonly occurs does not make the clause more or less legal." This is an accurate statement, but not applicable. Instead, the district court should have applied the logic from the passage, and concluded that requiring governmental subdivisions to disprove the existence of *any* potential liability before entering into an agreement would result in every agreement being unconstitutional without a vote; and similarly requiring subdivisions to present any agreement for a vote before proceeding would result in undue delays and restrictions to governmental progress.

This is not to say that every non-appropriation lease necessarily yields no long-term liabilities. But, as is the case here, in a lease where the subdivision is truly not subject to damages from not renewing the lease, and where no party has identified a specific liability, it does not make sense to require the District to disprove all *potential* liabilities.

In Respondent's Brief, he claims that "the possible remedies in equity alone . . . qualify as a liability under Feil." The district court was also concerned with equitable remedies. Again, neither specifically points to what such an equitable remedy would look like. Further, neither claims that such an equitable remedy would expose the District to monetary damages. An

---

[7] *See, e.g.*, *Hilden v. Ball*, 117 Idaho 314, 341, 787 P.2d 1122, 1149 (1989) ("[T]he plaintiff also had to prove a negative . . . This is an absurdity.").

equitable remedy that does not require the District to pay monetary damages (even if the District already committed the wrong), is not the sort of liability the framers intended to prevent with Article VIII, section 3. This Court has clearly held that that provision is meant to prevent governmental subdivisions from getting in over their heads *financially*. *See Koch v. Canyon Cty.*, 145 Idaho 158, 177 P.3d 372 (2008).

Even an action resulting in an order for specific performance of the terms of the lease would not bind the District to pay for more than it has available in the fiscal year because the terms of the lease are clear in that it is only for one year at a time and renewable in the District's sole discretion. Similarly, an action resulting in an injunction against the district barring it from occupying the Centre Facility or the like would also not bind the District to pay for more than it has available in the fiscal year because such an injunction would not mandate the District pay anything, simply abstain from using the Centre Facility. Even if such remedies were available against the District, they are not the sort of liability the Framers intended to prevent because there is no financial requirement for the District to pay which could bind future officials or taxpayers.

Finally, both Respondent and the district court were concerned with whether the lease agreement here was in fact a lease, or rather was a disguised sale or an equitable mortgage. The district court was "not convinced the lease agreement is, as a matter of law, a true lease," and wondered "whether the lease transaction is in fact an equitable mortgage." The district court did not ultimately determine the characterization of the agreement, just that it *may* not be a true lease, and that if it were so construed there would be "corresponding liability." However, neither the district court nor Respondent points to any specific liability that such a classification would create. Neither argues that such a classification would prevent the District from having the sort of freedom to walk away without penalty it has under the lease's terms.

In fact the only substantive argument made with regards to any such potential liability is that such a structure "will serve to allow municipalities to circumvent Article VIII, § 3 at will." If the District has not incurred a liability under this structure (and no specific liability under the lease is suggested), then it has not circumvented the Constitution at all. We follow our previous holdings and continue to "doubt whether it makes any difference whether [the document] may be appropriately denominated a lease or a conditional sales contract." *Williams v. City of Emmett*, 51 Idaho 500, 506, 6 P.2d 475, 477 (1931). We simply examine the terms of the agreement and

13

consider whether they bind the District to more liability than it can pay off in the fiscal year. As discussed above, the terms of the Centre Lease do not.

We thus hold that the Centre Lease does not subject the District to more liability than it could pay in the year in which it was entered and therefore that it does not violate Article VIII, section 3 of the Constitution.

> 3. *Examining the overall agreement is required here, and it also passes constitutional muster.*

The statute under which this case was brought provides that "upon hearing the court shall examine into and determine all matters and things affecting each question submitted [and] shall make such findings with reference thereto and render such judgment and decree thereon as the case warrants." I.C. § 7-1308. We find this case warrants examination of the comprehensive agreement, and hold it constitutional as the MDA, the PSA, and the RDA do not subject the District to greater liabilities than it has funds to pay in the fiscal year in which they were entered.

The MDA and the PSA are indisputably matters and things that affect the question which the District submitted, and therefore the court had a duty to examine into them to determine the validity of the Centre Lease. Neither party denies that the MDA, PSA, and RDA affect the Centre Lease.[8] The Centre Lease directly references the MDA; together, they are part of an overall scheme. Therefore the district court correctly recognized they were to be examined together.

The MDA and the PSA (both already executed) create a binding obligation that the District purchase the Centre Facility when construction is completed. This is a present liability the District has incurred, and it did so without a vote. Thus the issue here is whether or not the District currently has sufficient funds to perform its obligation to purchase the Centre Facility when performance is due. The District claims it does. It first alleges that the Agency, upon judicial confirmation of the lease, will assume its obligation to purchase the Centre Facility. The District further alleges that if it fails to obtain judicial confirmation, it has put funds sufficient to cover the purchase price into a fund dedicated to that purpose.

The district court, acting as finder of fact, believed the District's affidavits that the fund contained the full purchase price. There is nothing suggesting that doing so was clearly erroneous. The District thus argues that the liability it incurred by agreeing to purchase the

---

[8] In Appellant's Reply brief, it concedes: "As Mr. Frazier correctly points out, the documents [the MDA, RDA, and Centre Lease] work together and are intended to be read together."

Centre Facility either is covered by the Agency (in the event of judicial confirmation), or is covered by cash it has on hand. This Court is satisfied that in fact the District has set aside sufficient funds to cover the entire purchase price of the Centre Facility in the event that judicial confirmation was not obtained.

But Respondent further argues that another provision of the MDA, § 3.3.2, makes it unconstitutional without supermajority voter approval. That section provides that:

> The District, Gardner and the Gardner Affiliate all further acknowledge and agree that the Lender[9] may impose additional reasonable obligations upon their respective performance under the Project Documents, including, but not limited to, requiring notice of any party's default under any of the Project Documents; granting the Lender a security interest in the Property, the Project, and the Buildings.

Respondent claims that this provision "imposes on the District continuing, open-ended obligations and a security interest liability that could affect the *Centre Facility* that is the subject of the *Centre Lease*[.]" Respondent argues that "[b]y granting to the Lender the right to impose a security interest on the [the Centre Facilities] . . . , the District has clearly agreed [to] an open-ended liability in contravention of Article VIII, section 3 of the Idaho Constitution.". Appellant counters that the provision is "simply a recognition of construction loan priority until the time of purchase.". Appellant supports its argument with the fact that any such additional reasonable obligations necessarily must extinguish at the time the sale is closed. Appellant points to a PSA provision, which requires the Developer (Gardner) to deliver clear title by special warranty to the District (or the Agency if judicial confirmation is obtained before), to show that the Lender would not have an interest in the Centre Facilities extending beyond their sale. Appellant's analysis is correct. The provision of the MDA in question restricts any obligations the Lender could impose upon the district to those that are performance related. Because final sale of the Centre Facility will constitute full-performance by both parties, any performance-related obligations would necessarily be completed. Any liens imposed by the Lender on the Centre Facility would have to be released or Gardner would not be able to perform its duty to convey clear title.

Therefore, we hold that the overall agreement entered into by the District does not subject it to long-term liability greater than it had the funds to pay for in the year in which it was entered. Consequently, the Centre Lease is proper under Article VIII, section 3.

---

[9] "Lender" here is not Wells Fargo, but Gardner's Project Lender(s).

**B.      Respondent is not entitled to attorneys' fees.**

Respondent requested attorneys' fees in his Brief before this Court. The Idaho Appellate Rules require a respondent seeking attorneys' fees to state in his or her brief "that respondent is claiming attorneys' fees and state the basis for the claim." IDAHO APP. R. 35. While Respondent did state he requested attorneys' fees, his brief is devoid of authority. Respondent filed a motion for leave to file a supplemental brief providing argument and authority for an award of fees, but that motion was denied.

Regardless of any authority or argument presented, attorneys' fees would not be granted in this case. This case presents issues of first impression before this Court. Further, no party submitted any arguments not well-grounded in fact or reason. In light of the above factors and the issues of this case, no grant of attorneys' fees on appeal would be proper.

## VI. CONCLUSION

We reverse the district court's holding that the Centre Lease violated the Constitution. We hold that the District is entitled to judicial confirmation of the Centre Lease pursuant to Idaho Code section 7-1304. Due to its genuine non-appropriation provisions, the Centre Lease does not subject the District to greater liabilities than it has the funds to pay for in the year in which it was entered, and therefore the Centre Lease is proper under Article VIII, section 3 of the Constitution. We find that the district court was correct to review the overall agreement in this case, but we find that it too satisfies Article VIII, section 3 of the Constitution. We do not award attorneys' fees on appeal. Costs on appeal are awarded to the District.

Chief Justice J. JONES and Justice BURDICK CONCUR.

Justice EISMANN, concurring in the result.

The issue in this case is whether the Centre Lease violates article VIII, section 3 of the Idaho Constitution. The Greater Boise Auditorium District ("District") currently owns the Boise Centre, a meeting and event space in downtown Boise. KC Gardner Company, LLC, ("Developer") is currently constructing a building (the "Centre Building") adjacent to the Boise Centre and a building (the "Clearwater Building") adjacent to the Centre Building. The District has contracted with Gardner to purchase the Centre Building and to lease space in the Clearwater Building with an option to purchase the leased space. The District has sufficient funds available to purchase the Centre Building, but it desires to finance that purchase in order to use its funds to purchase the facilities in the Clearwater Building, to construct a sky bridge connecting the Centre

16

Building and the facilities in the Clearwater Building, and to make improvements to the Boise Centre.

In order to finance the purchase of the Boise Centre, the District entered into a transaction with the Capital City Development Corporation (the "Agency"). The Agency is not bound by the strictures of article VIII, section 3 because it lacks the power to levy and collect taxes and is not an alter ego of the City of Boise. *Boise Redev. Agency v. Yick Kong Corp*., 94 Idaho 876, 882-83, 499 P.2d 575, 581-82 (1972).

The District agreed to assign to the Agency the District's right to purchase the Centre Building, and the Agency agreed to purchase the building from the Developer. Wells Fargo Bank, N.A., agreed to loan the Agency sufficient funds to purchase the building. The District and the Centre then entered into the Centre Lease under which the Agency would lease the Centre Building to the District and grant the District an option to purchase it. The Agency is contractually required to deposit the lease payments made by the District into an account from which the payments will be made on the promissory note given by the Agency to Wells Fargo for the purchase price of the building.

The Centre Lease does not obligate the District for a period exceeding one year. The lease term commences upon the closing date of the purchase of the property by the Agency and it ends on the following November 30. The District has the funds available to pay the initial term of the lease. The District then has the option, in its sole discretion, to renew the lease for one year. Under the lease, it may do so twenty-four consecutive times, with each renewal being for a one-year term. The District must take affirmative action to renew the lease each year. To renew the lease, the District must give notice of its intent to renew the lease for one year and budget an amount sufficient to make the rental payments for that year. Thus, under the terms of the lease the District is not contractually obligated to lease the property for a period exceeding one year. The applicable year is the District's fiscal year. *Theiss v. Hunter*, 4 Idaho 788, 794, 45 P. 2, 3 (1896). To renew the lease for a one-year term, it must budget sufficient funds to make the lease payments during that year. Therefore, by entering into the Centre Lease the District will not "incur any indebtedness, or liability, in any manner, or for any purpose, exceeding in that year, the income and revenue provided for it for such year." Idaho Const. art. VIII, § 3.

If, in any year, the District fails to renew the lease according to its terms, the lease will terminate, and no provision of the lease will survive termination except certain provisions of Section 8.12 of the lease. That section requires the District "to presently budget and commit $350,000 to be held by the District in a fund to be called the 'Lease Contingency Fund.' "

17

With respect to $250,000 of the lease contingency fund, Section 8.12(a) of the Centre Lease provides:

> $250,000 of the Lease Contingency Fund shall be held as the sole source of payment for reasonable attorneys' fees, costs and expenses incurred by the Agency as a result of any claims for bodily injury or property damage, other than property insured, made against the Agency that arise from the negligent acts or omissions of the District, and to reimburse the Agency for the cost of any increased insurance premiums incurred by the Agency resulting solely from its acquisition of the Financed Project or issuance of the Note. The Agency and the District agree to seek and use insurance proceeds prior to use of the Lease Contingency Fund.

The lease provides that this $250,000 is the "sole source" of the payment of attorney fees, costs, and expenses incurred by the Agency as a result of any claims for bodily injury or property damage made against the Agency "that arise from the negligent acts or omissions of the District." Article VIII, section 3, only applies to voluntarily incurring a debt or liability; it does not apply to liability created by negligent acts. *Cruzen v. Boise City*, 58 Idaho 406, 418-19, 74 P.2d 1037, 1042 (1937). Therefore, even if in some manner the District became liable to the Agency for an amount exceeding $250,000 due to the District's negligence, there would be no violation of article VIII, section 3. This provision of the lease also provides that the $250,000 can be used for certain increased insurance premiums, but that contractual liability is limited to the amount in that contingency fund. Therefore, it does not cause the District to incur a debt or liability in an amount exceeding its annual income or revenue.

With respect to the remaining $100,000 of the lease contingency fund, Section 8:12(b) of the lease provides:

> $100,000 of the Lease Contingency Fund shall be held as the sole source of payment for reasonable fees, costs, expenses, losses and liabilities of the Bank relating specifically to the Financed Project.

This creates a contractual liability to Wells Fargo, but the extent of the liability is limited to the $100,000 in the contingency fund. It does not incur a debt or liability exceeding the District's annual income or revenue because the fund is already in existence. This obligation to Wells Fargo does not survive the termination of the lease.

The district court held that the Centre Lease violated article VIII, section 3 because it was not a true lease; it was a conditional sale contract. The district court is correct that the lease is a conditional sale contract. Once the promissory note has been paid in full through the lease

18

payments, the District has an option to purchase the property by paying a nominal sum unrelated to the fair market value of the property.[10] During oral argument, the District admitted that the lease is a conditional sale contract. However, whether it is a lease or a conditional sale contract does not change the analysis under article VIII, section 3 of the Idaho Constitution. As this Court stated in *Williams v. City of Emmett*, 51 Idaho 500, 6 P.2d 475 (1931): "We doubt whether it makes any difference whether it may be appropriately denominated a lease or a conditional sales contract. The important matter is, does it create 'any indebtedness or liability in any manner or for any purpose, exceeding in that year the income and revenue provided for it for such year'?" *Id.* at 506, 6 P.2d at 477.

If the District was contractually obligated to make lease payments in the future, then all of those payments would be aggregated to determine whether the lease violated article VIII, section 3. *Id.* at 507, 6 P.2d at 477; *Boise Dev. Co. v. Boise City*, 26 Idaho 347, 363, 143 P. 531, 535 (1914). Under the terms of the Centre Lease, the District is not contractually bound to make any future lease payments. It only becomes contractually bound to make a lease payment in the future if it elects to extend the lease for one more year, and then it is only contractually bound to make a lease payment for that year. Therefore, the total payments that will be made if the District exercises its option each year to extend the lease are not aggregated to determine whether article VIII, section 3 is violated.

Mr. Frazier contends that because the Centre Lease is in reality a conditional sale agreement for the purchase of real property, this Court should adopt a different standard for judging its constitutionality under article VIII, section 3. He contends that otherwise it will permit municipalities to circumvent that constitutional provision. Drafting a contract that does

---

[10] Section 11.3 of the Centre Lease provides:

> Option to Purchase Following Full Payment or Defeasance of the Note. Provided that the Note and any instrument issued to refund the Note shall have been paid in full or defeased in full, the District shall have the Option to Purchase the Financed Project. The District shall provide notice to the Agency of the exercise of its Option to Purchase under this Section 11.3 within sixty (60) days of full payment or defeasance of the Note. The closing of the Option to Purchase shall take place within thirty (30) days following such notice. The purchase price payable by the District shall be the sum of the following:
> > (a) An amount equal to any unpaid Agency's Fees and Expenses; and
> > (b) The sum of $10 for the Financed Project.

If the District acquires sufficient funds to prepay the note, it could also exercise its option to purchase sooner.

not violate the constitutional provision is not circumventing it. It is simply seeking to comply with it.

Implicit in Mr. Frazier's argument is that if the District renews the lease for a number of years, it will be compelled to continue doing so in order to protect its "equity" in the building. " 'The meaning of the constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it.' " *Cohn v. Kingsley*, 5 Idaho 416, 436, 49 P. 985, 992 (1897). "If it [the Constitution] is to be amended, the amendment should come from the people in the constitutional manner, and not by way of judicial construction." *Feil v. City of Coeur d'Alene*, 23 Idaho 32, 58, 129 P. 643, 652 (1912). There is nothing in the wording of article VIII, section 3 that would permit a contract for the purchase of real estate to be treated differently from a contract to purchase goods or services. Likewise, there is nothing in the wording of the provision that applies to any compulsion to continue renewing a contract where there is no contractual obligation to do so.

In order for the constitutional provision to apply, the entity must "incur any indebtedness, or liability, in any manner." Those words must be construed according to what they were understood to mean at the time the Constitution was ratified. *Idaho Press Club, Inc. v. State Legislature*, 142 Idaho 640, 642, 132 P.3d 397, 399 (2006). In *Feil*, this Court addressed the meaning of the word *liability*. Quoting from Bouvier's Law Dictionary, this Court stated that liability means, " 'Responsibility; the state of one who is bound in law and justice to do something *which may be enforced by action*.' " 23 Idaho at 50, 129 P. at 649 (emphasis added). Quoting from Anderson's Law Dictionary, this Court stated that liability means, " 'The state of being bound or obliged in law or justice to do, pay, or make good something; *legal responsibility*.' " *Id*. (emphasis added). It is clear that the word *liability* meant a legal responsibility that could be enforced in a court of law. The future lease payments that the District may in the future incur by electing to extend the lease term are not presently enforceable in a court of law. The word *indebtedness* was understood to have a narrower meaning that *liability*. *Id*. Bouvier's Law Dictionary (rev. 6th ed. 1856), stated that "in order to create an indebtedness, there must be an actual liability at the time, either to pay then or at a future time." http://www.constitution.org/bouv/bouvier.htm (accessed Sept. 26, 2015). Anderson's Law Dictionary (1889) defined *debt* as: "A liquidated demand. A sum of money due by certain and express agreement." https://archive.org/details/cu31924022836534 (accessed Sept. 26, 2015). Thus, a debt and a liability must be a legal obligation to pay a sum of money. The Centre Lease does not obligate the District to renew the lease in the future. The only legal obligation that the District will incur under the lease is to make the lease payment for the current lease term, which will not be greater than a one-year term.

20

Article VIII, section 3 does not prohibit incurring a debt or liability. It only prohibits doing so in an amount "exceeding in that year, the income and revenue provided for it for such year." Our Constitution does not prohibit incurring a debt or liability in anticipation of revenues "where the obligation or liability incurred anticipates the *revenues already provided for that year*, and where the *revenues of the current year* will meet and liquidate the obligation. Our Constitution specifically prohibits anticipating the *income* or *revenue* for *more than the current year*." *Feil*, 23 Idaho at 45, 129 P. at 647. As long as the District will have income and revenue in the fiscal year to make the lease payment that will come due if it extends the lease for one more year, it will not violate the constitutional provision. There is no contention that the District would have insufficient income and revenue to make a one-year lease payment.

In holding that the Centre Lease violated article VIII, section 3, the district court stated: "If the District defaults on the lease, and the Agency has no ability to pay the debt, Wells Fargo will be allowed to pursue its remedies. As discussed above, the District does not establish that Wells Fargo will be barred from pursuing remedies against the District." If the Agency is not able to pay the note it gave Wells Fargo, then the bank can foreclose its deed of trust. The district court did not identify what remedies the bank could possibly have against the District.

The district court also held that the Centre Lease violated article VIII, section 3 because, "While the promissory note will be between the Agency and Wells Fargo, the Court is not convinced there is no theory of law or set of facts under which Wells Fargo could not recover against the District." The district court could not envision any such theory, other than that the Centre Lease could be construed to create an equitable mortgage. Based upon that possibility, the court stated, "If the lease is later construed as an actual or equitable mortgage, there is a corresponding liability." Assuming that the Centre Lease could be construed as an equitable mortgage, the question is, "What corresponding liability"?

The Centre Lease provides that "nothing in this Lease shall be construed to require the District to renew the Lease or to exercise its Option to Purchase the Financed Project." One of the four requirements for an equitable mortgage is that there is "a debt, definite in amount, due from the mortgagor to the mortgagee." *Suchan v. Suchan*, 113 Idaho 102, 110, 741 P.2d 1289, 1297 (1986). The District would have to be the mortgagor. What debt would it owe to Wells Fargo? The most that it could owe would be a lease payment due for a one-year lease term. Under the terms of the lease, the District would have budgeted to make that payment.

21

For the above reasons, I would reverse the judgment of the district court.

Justice HORTON joins in this concurrence